# BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION

IN THE MATTER OF:

**B.C., THE STUDENT, and**
**K.C., THE PARENT,**
     *Petitioners,*

*v.*

**KNOX COUNTY SCHOOLS,**
     *Respondent.*

**APD Case No. 07.03-252859J**

## AMENDED FINAL ORDER[1]

This contested case was heard from October 21 to October 23, 2025, via an in-person hearing in Knoxville, Tennessee. Administrative Law Judge Steve R. Darnell, assigned by the Department of State, the Administrative Procedures Division (APD), presided at the hearing. This case is regarding an alleged denial of a free and appropriate public education (FAPE) and an alleged violation of the least restrictive environment (LRE) mandate under the Individuals with Disability Education Act (IDEA), 20 U.S.C.A. § 1400(d) and 20 U.S.C.A. § 1414(d)(1)(A)(i)(V). The hearing was conducted pursuant to TENNESSEE CODE ANNOTATED § 49-10-606(a) and State Board of Education Rules, Special Education Programs and Services, TENN. COMP. R. & REGS. 0520-01-09-.18. Attorneys Chris Sailer and Jeffrey Miller represented the Petitioners. Attorney Amanda Lynn Morse represented the local education agency (LEA), Respondent, Knox County Schools (KCS).

---

[1] Amended only to modify paragraph 2 under the "**ORDER**" section by replacing paragraph 2 in its entirety and replacing it with the following language: "B.C. will be placed in a temporary (not exceeding 18 weeks) diagnostic placement at Farragut Middle School for the purposes of determining the function of his behavior." *THIS MODIFICATION DOES NOT CHANGE OR EXTEND THE FINAL ORDER APPEAL TIME.*

1.      Did Petitioners show, by a preponderance of the evidence, that the May 15, 2025, proposed Individualized Education Program (IEP) denied B.C. access to a FAPE?

2.      Did Petitioners show, by a preponderance of the evidence, that the proposed placement at the special day school, Ridgedale, was not B.C.'s least restrictive environment (LRE) at this time?

3.      Did Petitioners show, by a preponderance of the evidence, that KCS was deliberately indifferent to B.C.'s need for behavioral and communication supports and services in violation of the Americans with Disability Act and § 504 of the Rehabilitation Act?

**SUMMARY OF DETERMINATION**

It is **DETERMINED** that Petitioners carried the burden of proof and showed, by preponderance of the evidence, that KCS's failure to address B.C.'s underlying communication needs and behavior issues in the school setting denied him FAPE in violation of the IDEA, Americans with Disability Act, and § 504 of the Rehabilitation Act. Further, KCS's proposed placement of B.C. at the special day school, Ridgedale, would not educate him in the LRE in violation of the IDEA. This determination is based on the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.      B.C. is an 11-year-old with autism spectrum disorder (ASD) who is enrolled in the sixth grade at Gibbs Middle School (Gibbs) in the Knox County school system. B.C. is described as a friendly, silly, and social child. He wants to be around other children and seeks out opportunities to be close to his non-disabled peers. B.C. is minimally verbal.

2.      B.C. attended kindergarten and first grade at Peer Academy, a private school for students with disabilities. B.C. enrolled at Gibbs for his second-grade year, 2021-22. At Gibbs,

B.C. attended school two to three days a week during his second and third-grade years. For the rest of the week, the LEA approved B.C. to attend Applied Behavior Analysis (ABA) therapy in a clinical setting.

3.      When B.C. first enrolled at Gibbs, he would not interact with his peers. If a peer approached him, he would turn and walk in the opposite direction. Over time, he began dancing with his peers during movement time, learned to give high-fives and fist bumps, and started tolerating group activities.

4.      By fourth grade, B.C. had begun interacting with his peers in class and participating in games and activities that required turn-taking. By fifth grade, B.C. had grown to the point that he enjoyed participating in group activities. He was no longer so prompt-dependent in social situations and was becoming "much more interactive" in academic activities, even in non-preferred subjects like English Language Arts.

5.      B.C. began attending Gibbs Elementary full-time in his fourth-grade year, 2023-24. During fourth grade, Gibbs' staff physically restrained B.C. 117 times, mostly due to self-injurious behavior (SIB).

6.      B.C.'s fourth-grade IEP, adopted October 2, 2023, did not mention B.C.'s self-injurious behavior. The IEP included no goals to address his self-injurious behavior. There was no specially designed instruction specifically intended to reduce his self-injurious behavior, nor were there any related services to support his behavior.

7.      Instead, the IEP offered 45, 30-minute sessions of speech therapy per year and 4.5 hours per year of "autism support" as a consultative service to B.C.'s teacher.

8.      B.C.'s behavior plan, adopted in the same IEP meeting, did not list self-injurious behaviors as a separate target behavior. Instead, it combined self-injurious behavior with physical aggression.

9.      The district assigned a "behavior liaison" to work with B.C. and his teachers. This "behavior liaison" was not licensed or credentialed to provide ABA therapy. Although B.C. required the behavior liaison's services, these services were not documented in his IEP, and the frequency, duration, and setting of the services are unknown.

10.     KCS adopted a new policy permitting private providers to serve students during the school day with certain limitations. B.C.'s private Board-Certified Behavior Analyst (BCBA) worked with a Registered Behavior Technician (RBT) to correct B.C.'s behaviors. The RBT attended school with B.C. approximately 20 hours per week. Since B.C.'s RBT was not a KCS employee, she could not be present when B.C.'s behavior escalated, nor could she intervene to modify his behavior.

11.     The parties agree that B.C.'s behavior is directly related to his inability to communicate. B.C. communicates using an augmentative and alternative communication (AAC) device, gestures, unintelligible vocalizations, and some single-word utterances. When he is unable to communicate, he uses behavior to convey what his few words cannot.

12.     He is interested in and wants to connect with adults and peers in his classroom. He frequently turns toward a speaker, initiates interactions, and engages with his peers by being close to them in their space and vocalizing. He enjoys participating in peer groups.

13.     B.C.'s AAC device is his primary mode of communication. He understands and values its use, takes ownership of it, and makes sure he always knows where it is. He can use his AAC device to communicate about things he wants and needs.

14.     B.C.'s ability to communicate is severely impacted by his ASD. He is unable to independently identify or label his feelings. He is unable to use language at the level necessary to express what he has learned in class. Classroom observers note that he seems frustrated by the communication demands of academic activities. Although B.C. enjoys being near his peers, he

does not typically greet or give farewells without prompting. He does not use his AAC device for social purposes.

15.     B.C. struggles to give reliable responses to simple "yes/no" questions. On occasion, he will answer a "who," "what," or "where" question, but he is unable to answer "when," "why," or "how" questions. He does not ask questions, elaborate on topics, or initiate conversations. He is unable to spell or write.

16.     B.C.'s expressive vocabulary consists almost entirely of concrete nouns like "break," "Sprite," "squeezes," "bathroom," or "Cheez-Its." His receptive vocabulary is larger but still very limited.

17.     B.C.'s capabilities with his AAC are rudimentary. B.C.'s speech therapist and classroom staff have been trained on how to program and access functions on B.C.'s AAC. However, KCS has not provided any direct services to B.C., such as a communication partner to help him progress with the use of his AAC.

18.     Many of B.C.'s fourth-grade IEP goals were focused on basic functional skills like writing his name and recognizing letters. Others emphasized rote compliance instead of functional independence. For example, B.C. was expected to "stay in his area for 80% of the day," or "follow his schedule and switch schedule pieces in and out on his first, then board with 100% accuracy." End-of-the-year progress monitoring did not clearly indicate whether B.C. mastered any of his fourteen objectives. Three of B.C.'s fourteen IEP objectives had been repeated from third grade. (Exhibit 6).

19.     B.C.'s IEP team met 18 times during his fourth-grade year. Each time they met, the IEP team discussed B.C.'s restraints, what led to them, and whether there had been any changes in B.C.'s life. But, aside from the IDEA-required annual update, the team made no

changes to B.C.'s IEP or behavior intervention plan (BIP), despite the extraordinary number of restraints.

20.     In the spring of B.C.'s fourth-grade year, some members of his IEP team met on at least two occasions and discussed B.C.'s potential placement at Ridgedale School, a segregated special day school. KCS referred to these meetings as "professional reviews." B.C.'s parents were not invited to participate in these "professional reviews."

21.     On April 17, 2024, four months before KCS proposed changing B.C.'s placement, after one of these reviews, Ridgedale IEP facilitator Carrie Otto emailed Regional Special Education Supervisor Kristi Phillips and then-Ridgedale Principal Rebecca Bittner. The subject of the email was "possible new arrivals." It included details about B.C.'s programming needs and noted that his teacher at Ridgedale was "TBD." This was four months before KCS proposed a change of placement in an IEP meeting.

22.     KCS staff held another "professional review" in August 2024, at the start of B.C.'s fifth-grade year at Gibbs. During this meeting, KCS staff discussed B.C.'s behaviors and the plan to place B.C. at Ridgedale. The team did not discuss continued placement at Gibbs because the team did not feel that B.C. could be safe at Gibbs.

23.     On August 27, 2024, B.C.'s IEP team met to develop his annual IEP. Supervisor Phillips was present for the meeting, along with Ridgedale facilitator Carrie Otto, new Ridgedale Principal Donna Brunson, KCS behavior liaison Turk Underwood, and regular members of B.C.'s IEP team, like his special education teacher, Shelby Linginfelter, and speech therapist, Belinda Minarchan. B.C.'s private RBT, Liberty Getchel, was also present.

24.     The meeting began with a review of three recent physical restraints. One was terminated after B.C. started gagging.

25.     The team transitioned to the annual IEP meeting. K.C. told the team that B.C.'s behaviors were her main concern and that he had begun taking the medication Risperdal to help with his behaviors. She believed that B.C.'s communication deficits led to his behaviors, and she expressed her desire for him to be able to communicate instead of relying on behaviors.

26.     Next, the team updated B.C.'s behavior intervention plan. The IEP team left the plan virtually unchanged from fourth grade. No new functional behavior assessment was requested, and self-injurious behavior was still not listed as a target behavior.

27.     Like his previous fourth-grade IEP, B.C.'s new fifth-grade IEP made no mention of his self-injurious behavior. There were no present levels describing his self-injurious behavior or its impact on his learning. There were no IEP goals to reduce B.C.'s self-injurious behavior. There was no specially designed instruction, and no related services specifically intended to address B.C.'s self-injurious behavior. The IEP goals emphasized rote compliance over functional independence. This time, nine of the thirteen objectives were repeated from previous years.

28.     KCS proposed placement at Ridgedale School, a segregated special day school across the county from B.C.'s home. K.C. told the team that she was not opposed to placement at Ridgedale, but she wanted time to see whether the new medication or the ABA therapy would have an impact before agreeing to the change.

29.     The team agreed to postpone the decision. But a few weeks later, the team placed B.C. at Ridgedale over K.C.'s objection. K.C. filed a due process complaint *pro se* and invoked the stay put to maintain B.C.'s placement at Gibbs.

30.     K.C. agreed to dismiss her due process complaint when KCS withdrew its placement recommendation, pending the outcome of a comprehensive reevaluation that would

include psychoeducational, speech/language, and assistive technology components. KCS also agreed to conduct a new functional behavior assessment, performed by a BCBA.

31.    The evaluation results were presented and discussed in a series of IEP meetings on February 5, February 27, March 7, and March 27, 2025.

32.    The purpose of B.C.'s assistive technology (AT) re-evaluation was to determine if B.C.'s current AAC device met his needs and what, if any, additional supports were needed to assist B.C. in expressing himself effectively.

33.    The AT evaluation included specific recommendations for program planning, including:

a.    "Customize his device to allow for expression of novel thoughts and utterances using robust vocabulary, while also keeping it easy for him to navigate for the most effective use in all situations."

b.    "Support and provide communication opportunities for [B.C.] to express his wants and needs, as well as communicate for different academic and social tasks throughout his day."

c.    "Support communication opportunities for [B.C.] to interact with a wide variety of people for a variety of reasons."

d.    "Plan to have low-tech/no-tech back up AAC supports…to have for use in the case of an emergency or at a time when high-tech options are not available."

e.    "Support and/or create communication opportunities for [B.C.] to improve independent communication skills to advocate for himself."

f.    "Model and practice communication for a variety of purposes (commenting, informing, asking, requesting, rejecting, engaging socially, etc.) using a multimodal communication approach."

g.  "Model expanded phrases and utterances on his device, building on his expression of mostly one-word/one-unit utterances (ex. If he requests "break" model "I+want+break" on his device)."

34.  K.C. again shared her concern that B.C.'s limited communication skills were the cause of his behaviors, and she requested that B.C.'s IEP focus on "building functional and social communication skills." In response, the IEP team revised B.C.'s communication goal to include two new objectives. But no other substantive changes were made to the IEP, and none of the AT evaluation's program planning recommendations were directly incorporated into the IEP.

35.  B.C.'s SIB ranges in intensity from "light tapping" (where B.C. will tap his head with an open hand) to "head banging" (where he will hit his head on hard objects in a manner that causes a jarring of the head or neck or makes an audible sound).

36.  There is no evidence that B.C.'s SIB has ever resulted in any serious injury at school. The 11 injury reports placed into evidence denote that seven minor injuries were reported over a three-month period, from July 9, 2024, to September 30, 2024. Only one minor injury occurred after September 30, 2024.

37.  Seven of B.C.'s minor injuries occurred at the site of an old scab, or keloid formation, that had reopened on his forehead. A C.T. scan of B.C.'s head was normal and revealed no signs of brain injury.

38.  B.C.'s SIB at home has decreased in frequency and intensity over the course of B.C.'s fifth-grade year, to the point where the behavior now occurs only once every few weeks. K.C. attributes this change to B.C.'s use of Risperidone and to his resuming private A.B.A. therapy.

39.  B.C.'s SIB did not decrease while at school. KCS uses a "whole interval" method of tracking B.C.'s SIB. School staff divide B.C.'s school day into 28, 15-minute intervals. Staff

document how many intervals per day B.C. has SIB. If a behavior occurs just once within a fifteen-minute interval, the whole interval is marked. B.C.'s fourth-grade behavior plan, adopted on October 2, 2023, indicates that, on average, B.C. exhibited self-injurious behavior 0-2 intervals per day.

40.     B.C.'s fifth-grade behavior plan, adopted August 27, 2024, indicates that on average, B.C. exhibited self-injurious behavior 0-2 intervals per day.

41.     On November 8, 2024, KCS began conducting a new functional behavior assessment (FBA) for B.C. School staff tracked and preserved daily behavior data as part of this process. KCS's daily data tracking continued through the end of the 2024-25 school year. The chart below summarizes the number of *intervals* in which SIB and physical restraints were reported, by month, from November 2024 through March 2025.

| Month | Intervals of SIB per <u>Month</u> | Intervals of SIB per <u>Day</u> (on avg.) | Days per month without SIB | Restraints |
|---|---|---|---|---|
| Nov. 2024 | 19 | 1.47 | 13 | 1 |
| Dec. 2024 | 24 | 1.6 | 15 | 0 |
| Jan. 2025 | 20 | 1.2 | 17 | 0 |
| Feb. 2025 | 12 | .92 | 13 | 2 |
| Mar. 2025 | 25 | 1.56 | 16 | 0 |

42.     The chart indicates that B.C. exhibited, on average, 1-1.5 intervals of SIB per day, just as his previous behavior plans had reported. About 45% of the time, B.C. exhibited no SIB at all.

43.     Restraints dropped dramatically during this time, even as behavior remained constant. B.C. was physically restrained 117 times during his fourth-grade year; 22 times between August and October 2024 of his fifth-grade year; and just four times between November 2024 and May 2025 of his fifth-grade year.

44.     Tennessee law and therapeutic crisis intervention (TCI) training only permit physical restraint in an emergency situation. An emergency situation occurs when a student is at

risk of serious physical injury without restraint. Serious injuries include such things as broken bones, head injuries, a busted lip, teeth knocked out, etc. The decision to restrain a student is left to the discretion of individual staff members, based on a "dynamic risk assessment."

45. On March 27, 2025, B.C.'s IEP team adopted the new behavior intervention plan, based on BCBA Goforth's FBA. B.C.'s behavior, which had been constant for the past two years, substantially *increased* after the new behavior plan was implemented. The chart below summarizes KCS's SIB interval data from April 2025 to September 2025. (Exhibits 47, 51, 58).

| Month | Intervals of SIB per Month | Intervals of SIB per Day (on avg.) | Days per month without SIB | Restraints |
|-------|----------------------------|------------------------------------|----------------------------|-----------|
| April 2025 | 39 | 2.17 | 4 | 1 |
| May 2025 | 38 | 2.53 | 5 | 0 |
| June 2025 (ESY) | 74 | 6.72 | 0 | 0 |
| July 2025 (ESY) | 48 | 6.0 | 0 | 0 |
| August 2025 | 201 | 11.82 | 0 | 31 |
| September 2025 | 372 | 21.88 | 0 | 21 |

46. BCBA Goforth opined that B.C.'s SIB was primarily driven by his desire to escape or avoid non-preferred tasks and, to a lesser extent, by a desire to receive attention from staff. Goforth does not believe there is an automatic or sensory-seeking component to B.C.'s behaviors. This contradicted B.C.'s previous behavior plans, which had identified automatic sensory reinforcement as the primary function of B.C.'s SIB. There are instances where there are no clear antecedents to B.C.'s SIB, and the staff are sometimes unaware of what triggered B.C.'s behavior.

47. K.C. was concerned because the district's FBA did not distinguish between B.C.'s high-intensity and low-intensity behaviors, making it difficult to understand the function of the behaviors. She did not agree with the new behavior plan, in part because she believed the data was jumbled. At K.C.'s request, school staff began charting B.C.'s high-intensity and low-intensity behaviors to provide K.C. with additional information.

48.     By March 27, 2025, the re-evaluation was complete, the results were reviewed, and the IEP was updated. The terms of the mediated agreement were fulfilled. Just seven weeks later, on May 15, 2025, KCS convened another IEP team meeting. This was referred to as a "bump-up" meeting to transition B.C. to middle school. Representatives from Ridgedale, KCS's alternative school, attended this IEP meeting.

49.     Prior to the bump-up meeting, members of the IEP team met for three hours for a "professional review" without K.C. There had been eight professional reviews, totaling nearly 12 hours, since the beginning of February 2025 without K.C.'s participation.

50.     The May 15, 2025 IEP meeting began with updates to B.C.'s goals and present levels. Just like the fourth and fifth-grade IEPs, the proposed sixth-grade IEP focused heavily on compliance and rote skills instead of functional independence. New reading and speech/language goals were more robust. The updated IEP goals included items such as B.C. tracing his name, B.C. requesting squeezes,[2] and B.C. following his schedule, etc., and included several goals from his previous IEPs.

51.     B.C. would receive the same 45, 30-minute sessions of speech therapy he had received for years. He would receive the same 4.5 hours per year of "autism support." The only new service was a staff training on B.C.'s AAC device. But the IEP did not specify the frequency, duration, location, or content of the training. The IEP did not include behavioral liaison services or ABA therapy in the school setting.

52.     Over K.C.'s objection, the IEP proposed placing B.C. at Ridgedale. The meeting ended in disagreement, and KCS gave prior written notice that it intended to place B.C. at Ridgedale. This prompted K.C. to file a due process complaint to invoke the stay put at Gibbs.

---

[2] Squeezes are hugs to the upper body.

53.     Ridgedale is KCS's alternative school. The first floor of Ridgedale houses students removed from their zoned schools for disciplinary issues. The second floor is a segregated special day school for students with special educational needs.

54.     Ridgedale's special education program presently has 42 students, aged from kindergarten to 22, with 35 classroom staff. Ridgedale has two middle school comprehensive development classrooms (CDC), each with three to four students, one teacher, and two teacher aides. This is the same staffing level for Gibbs' CDC classroom.

55.     There are eight middle school students presently assigned to Ridgedale. Six are completely non-verbal, and one is minimally verbal. Two of the eight middle school students were placed at Ridgedale due to their aggressive behavior toward peers, a behavior B.C. does not presently exhibit.

56.     KCS proposes to place B.C. at Ridgedale until B.C.'s behaviors can be controlled so he can return to his zoned school, Gibbs.

57.     Ridgedale does not have an assigned BCBA. All staff have received 40 hours of training in "ABA strategies," but none of them have received actual certification as RBTs. Additionally, no ABA therapy is directly provided to Ridgedale students, and none of the behavior staff are directly supervised by a district BCBA.

58.     Petitioners showed, by a preponderance of the evidence, that KCS's failure to address B.C.'s underlying communication limitations and behavior issues in the school setting denied him FAPE in violation of the IDEA.

59.     Petitioners showed, by a preponderance of the evidence, that KCS was deliberately indifferent to B.C.'s need for behavioral and communication supports and services in violation of the Americans with Disability Act and § 504 of the Rehabilitation Act.

60.     Petitioners showed, by a preponderance of the evidence, that KCS's proposed placement of B.C. at the special day school, Ridgedale, would not educate him in the LRE in violation of the IDEA.

## CONCLUSIONS OF LAW

1.     Administrative judges with the Administrative Procedures Division, Tennessee Department of State, are bestowed jurisdiction to determine whether a student's rights have been violated under the IDEA and related state law. TENN. CODE ANN. § 49-10-606(a), State Board of Education Rules, Special Education Programs and Services, 0520-01-09-.18. The administrative judge also has jurisdiction to hear Petitioners' claims under § 504 and the ADA. *P.G., through his parents, A.G. and R.G. v. Genesis Learning Centers d/b/a Genesis Academy,* 2019 WL 3231363 (M.D. Tenn.).

2.     As the party "seeking relief," Petitioners bear the burden of proof in this matter to show, by a preponderance of the evidence, that KCS violated the IDEA, ADA, and/or § 504. *Schaffer v. Weast,* 546 U.S. 49, 51 (2005), *Doe v. Sumner Cty. Bd. of Educ.,* 2020 WL 5797980 (M.D. Tenn. Sept. 29, 2020).

3.     The findings of fact shall include a determination by the administrative judge regarding meaningful participation by the parent in the development of the individualized education plan (IEP) for the student. TENN. CODE ANN. § 49-10-606.

4.     The IDEA requires KCS to provide all students with disabilities who are in need of special education and related services a "FAPE" in the "least restrictive environment." 20 U.S.C. § 1400, *et seq.*

5.     KCS is required to identify students suspected of having a disability who are "in need of" special education and related services. 20 U.S.C. § 1401(3)(A). Students who are

eligible for special education and related services are entitled to an IEP. *Bd. of Educ. of the Hendrick Hudson School Dist. v. Rowley,* 458 U.S. 176, 181 (1982).

6.　　In developing educational programs and determining appropriate services for students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law. *Bd. of Educ. of the Hendrick Hudson School Dist. v. Rowley,* 458 U.S. 176, 182 (1982).

7.　　Pursuant to 34 C.F.R. § 300.321, a student's IEP must be developed by the student's IEP team and consist of the following:

    a.　The parents of the child;
    b.　Not less than one general education teacher of the child (if the child is or may be participating in the general education setting);
    c.　Not less than one special education teacher of the child, or, where appropriate, not less than one special education provider of the child;
    d.　A district representative who: i) is qualified to provide or supervise the provision of specially designed instruction to meet the unique needs of children with disabilities; ii) is knowledgeable about the general education curriculum; and iii) is knowledgeable about the availability of district resources.
    e.　An individual who can interpret the instructional implications of evaluation results;
    f.　Other individuals who have knowledge or special expertise about the child, including related services personnel as appropriate; and
    g.　Whenever appropriate, the child with the disability.

8.　　Under 20 U.S.C. § 1414(d)(1)(A), the student's IEP must include

(1) a statement of the child's present levels of educational performance;
(2) a statement of measurable annual goals,
(3) a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research,
(4) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the nonacademic and extracurricular activities,
(5) a statement of how the child's progress toward the annual goals will be measured, and
(6) a statement of how the child's parents will be regularly informed of their child's progress.

9.      These "are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. v. Boss,* 144 F.3d 391, 398 (6th Cir. 1998).

10.     A student's IEP comports with the IDEA if it is "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley,* 458 U.S. 176, at 207, 102 S.Ct. 3034, 3051 (1982).

11.     For a district to substantively offer FAPE for a child not fully integrated into the general education setting, an IEP must be reasonably calculated to enable the child to make progress appropriate to his circumstances. *Endrew F. v. Douglas County Schools,* 137 S. Ct. 988, 999 (2017). An IEP should be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 999. The student's progress must be more than *de minimis. Id.* at 1000.

12.     KCS is charged with providing B.C. with "the educational equivalent of a serviceable Chevrolet," but "is not required to provide a Cadillac." *Doe v. Tullahoma City Schools,* 9 F.3d 455, 459-60 (6th Cir. 1993).

13.     KCS is further charged with providing B.C. a FAPE in the LRE, or what is commonly referred to as mainstreaming. Despite the preference for mainstreaming, a student may be segregated from the general education setting when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class. *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983).

14.     The Sixth Circuit has described the LRE obligation under the IDEA as follows:

> The Act does not require mainstreaming in every case but its requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference. The proper inquiry is

whether a proposed placement is appropriate under the Act. In some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming. The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate. In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983). (Internal citations omitted).

15.     A LEA cannot ignore its LRE obligations because it is challenging or burdensome to the LEA. The Sixth Circuit has stated as follows:

We have held that a school district cannot prevail in an LRE case merely on the grounds that it believes mainstreaming is impossible, impractical, or counterproductive because the situation became challenging. *Knox Cnty., Tennessee v. M.Q.,* 62 F.4th 978, 994 (6th Cir. 2023) (Internal citations omitted).

16.     The IDEA does not afford relief for minor procedural violations alone. A determination of whether a student received FAPE must be based on substantive grounds. 34 C.F.R. § 300.513(1).

17.     When a procedural violation is alleged, an administrative judge can only find a FAPE violation if a procedural violation "(1) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit." 34 C.F.R. § 300.513(2).

18.     Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001), *Bd. of Educ. of Fayette County, Ky. v. L.M.,* 478 F.3d 307, 313 (6th Cir. 2007).

19.     KCS is required to give B.C.'s parents prior written notice (PWN) when it either proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child. 34 C.F.R. § 300.503(a).

20.     The IDEA and the Tennessee Special Education Behavior Supports Act (SEBSA) authorize the use of isolation and/or restraint when a student with a disability presents behaviors that create safety concerns for the student or others. 20 U.S.C.A. § 1415 (k)(1)(G), TENN. CODE ANN. § 49-10-1304 (a).

21.     SEBSA requires KCS to report to B.C.'s parents if KCS personnel impose an isolation or a "physical holding restraint" on the same day it occurs. TENN. CODE ANN. § 49-13-1301, *et seq*., KCS must also hold an IEP team meeting within 10 days of the isolation or restraint. TENN. CODE ANN. § 49-10-1304 (d) and (e).

22.     A "physical holding restraint" does not include "the holding of a student by an adult in order to calm or comfort the student…" or "contact necessary to physically escort a student from one area to another…" or "Physically redirecting a student if the student does not resist or if the resistance is of minimal intensity or duration…." TENN. CODE ANN. § 49-10-1303 (8)(A), (B), and (D).

23.     Tennessee statutes and regulations require the assessment (via an FBA) of a student's behaviors when there is a pattern of behavior that impedes the learning of others. TENN. COMP. R. & REGS. 0520-01-09-.24. However, Tennessee does not require an FBA prior to proposing a more restrictive setting when there is a "pattern of behavior that places the student or others at risk of harm or injury." TENN. COMP. R. & REGS. 0520-01-09-.24(11).

24.     The ADA and § 504 of the Rehabilitation Act are "roughly parallel" due to their similar language and the similarities in their purpose and scope. *Babcock v. Michigan,* 812 F.3d 531, 540 (6th Cir. 2016).

25.     Both acts allow for school districts to be held legally responsible for excluding individuals, denying benefits, or discriminating against individuals because of their disability. *Ghol v. Livonia Pub. Sch. Dist.,* 836 F.3d 672, 681 (6th Cir. 2016). KCS school staff could simultaneously violate the IDEA, the ADA, and § 504. *IL through Taylor v. Knox County Bd. of Edu.,* 257 F. Supp. 3d 964, 954-955 (E.D. Tenn. 2017), *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cnty., Ky.,* 637 Fed.Appx. 922, 924 (6th Cir. 2016). Thus, § 504 and ADA claims are typically analyzed together. *M.G. v. Williamson Cty. Sch.,* 720 F. App'x 280, 287 (6th Cir. 2018).

26.     Congress enacted the ADA partly to combat discriminatory segregation of individuals with disabilities from the rest of society. 42 U.S.C. § 12101(a)(2). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C § 12312. The ADA requires public entities to make reasonable modifications to their policies, practices, or procedures to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i). "The key word in this regulation (modification) connotes moderate (not significant) change." *Doe v. Knox Cty. Bd. of Educ.*, 56 F.4th 1076, at 1087.

27.     Section 504 of the Rehabilitation Act uses similar language and provides that a qualified disabled individual shall not, "solely by reason of her...disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a), *Doe v. Sumner Cty. Bd. of Educ.,* 2020 WL 5797980 n.3 (M.D. Tenn. Sept. 29, 2020).

28.     Under Title II of the ADA, a plaintiff must show that: (1) plaintiff has a disability; (2) plaintiff is otherwise qualified; and (3) plaintiff was being excluded from participation in, denied the benefits of, or subjected to discrimination under [a public program] because of

plaintiff's disability. *Anderson v. City of Blue Ash,* 798 F.3d 338, 357 (6th Cir. 2015). A plaintiff must make the same showing to establish a case under § 504 in addition to showing the program receives federal funding. *Hill v. Bradley Cnty. Bd. of Educ.,* 295 Fed. Appx. 740, 742 (6th Cir. 2008).

29.    When § 504 and the ADA are considered alongside the provisions of the IDEA, the "reasonable accommodation" requirement (as required to enable participation to a qualified individual pursuant to prong three) requires that a plaintiff prove that the school system "failed to supply him or her with a community-financed education which was sufficiently 'appropriate' to his or her personal learning requisites to enable his or her reasonable access to an education similar, relative to his or her individual academic potential and cognitive abilities, to that available to the average fellow student." *Campbell v. Bd. of Educ. of Centerline Sch. Dist.,* 58 Fed. Appx. 162, 166 (6th Cir. 2003), *G.C. v. Owensboro Pub. Schs.,* 711 F.3d 623, 635 (6th Cir. 2013).

30.    A plaintiff may allege disability discrimination under two available theories: intentional discrimination and failure to reasonably accommodate. *Wilson v. Gregory*, 3 F.4th 844, 859–60 (6th Cir. 2021); *Marble v. Tennessee*, 767 F. App'x 647, 650–51 (6th Cir. 2019); *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017). "In the education context, a showing of discrimination requires evidence of something more than a school district's failure to provide FAPE." *Knox Cnty., Tennessee v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023).

31.    In order to establish intentional discrimination, Petitioners must meet the same standard as any other discrimination claim, "deliberate indifference," not a higher burden of showing "bad faith or gross misjudgment." *A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 336 (2025).

32. A party acts with deliberate indifference if it disregards a "known or obvious consequence" of its actions, namely that its actions will violate the plaintiff's federally protected rights. *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410–11 (1997).

33. When the parents and school merely disagree about the necessary and appropriate accommodation for the student, there is no deliberate indifference. *R.K. v. Bd. of Educ.*, 637 F. App'x 922, 925 (6th Cir. 2016).

## ANALYSIS

The parties agree that B.C.'s behaviors are directly related to his inability to communicate through speech. However, KCS chose to address his behaviors with physical restraints rather than addressing the underlying cause. B.C.'s main form of communication should be his AAC device. Although his behaviors appear to be his main form of communication at school, KCS has offered no realistic assistance to B.C. to gain proficiency with his AAC device. School staff have limited knowledge of B.C.'s AAC device, such as how to program it and locate specific buttons. But KCS has not provided any direct services, such as a communication partner trained to teach B.C. how to effectively use his AAC device. Additionally, it was discovered at the hearing that B.C.'s school AAC device is not synced to his home AAC device.

KCS failed to provide direct ABA therapy in the school setting to reduce B.C.'s behaviors. KCS clearly understands the importance of ABA therapy, as evidenced by the use of ABA strategies at Ridgedale, and the fact that all education assistants there have received 40 hours of ABA technician training. It is unclear why, but KCS appears to have a policy of not providing direct ABA services to students. The private ABA services B.C. has received are no substitute. KCS's policy prohibits his private RBT from intervening when B.C.'s behaviors

escalate, and in fact, she is required to leave the area. B.C.'s RBT is not permitted to observe the very behaviors she is tasked to correct.

Placing B.C. at Ridgedale is not the LRE for his education. B.C. would not have contact with any non-disabled peers at Ridgedale. His classmates would be mostly other non-verbal children with significant disabilities. Although some Ridgedale students transition back to their zoned school, there is a high risk that B.C. will not return to Gibbs. B.C.'s LRE is at Gibbs. B.C.'s behaviors have continued in the sixth grade at Gibbs, and it will be challenging for KCS to educate B.C. at Gibbs. But as the Sixth Circuit said, an LEA cannot defend an LRE case because it is "impossible, impractical, or counterproductive" to the LEA. B.C. can be educated with his non-disabled peers at Gibbs with appropriate staffing, training, and related services.

KCS's arguments are not compelling. For two to three days a week during his second and third-grade years, KCS permitted B.C. to attend ABA therapy in a clinical setting in lieu of attending class at Gibbs. KCS cannot now argue that this arrangement interfered with B.C.'s education. KCS was obligated to monitor B.C.'s progress during his second and third-grade years. If he was falling behind, his IEP should have been amended to correct the deficiency.

B.C.'s IEPs for his fourth and fifth-grade years were not "reasonably calculated" to provide B.C. with educational progress and denied him FAPE. These IEPs did not provide appropriate behavioral interventions, ABA therapy, or direct services to educate B.C. on the use of his AAC device. Further, KCS's "professional review" meetings denied B.C.'s parents the right to meaningful participation in the development of B.C.'s IEPs. It appears KCS determined that B.C. was destined for placement at Ridgedale and did little to address the underlying cause of his behaviors.

## ORDER

1.      Within 10 days of this order, B.C.'s IEP team must reconvene to develop an interim IEP, consistent with this order, pending the results of the independent evaluation discussed below.

2.      B.C. will be placed in a temporary (not exceeding 18 weeks) diagnostic placement at Farragut Middle School for the purposes of determining the function of his behavior.

3.      KCS shall pay for independent evaluations, including functional behavior assessment/functional analysis, psycho-educational evaluation, speech and language evaluation, occupational therapy evaluation, assistive technology evaluation,[3] and an evaluation by a qualified expert of the quantity and type of compensatory education required to remedy B.C.'s loss of educational benefit.

4.      Upon receipt of the independent evaluations and programming recommendations, B.C.'s IEP team will revise B.C.'s IEP. At a minimum, the IEP must include: a 1:1 aide who has completed the 40-hour RBT training course and who has also completed communication partner training; direct ABA services through a BCBA and RBT as needed, in the school setting; and weekly collaboration and co-planning time for B.C.'s team.

5.      B.C. and K.C. are the prevailing parties in this case.

---

[3] The assistive technology evaluation should consider whether B.C.'s current AAC device is appropriate for him.

It is so **ORDERED**.

This ORDER entered and effective this the **22nd day of December 2025**.

STEVE R. DARNELL
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE